**Dawn MONTGOMERY, Relator,**

v.

**F & M MARQUETTE NATIONAL BANK, Department of Jobs and Training, Respondents.**

No. C5–85–2152.

Court of Appeals of Minnesota.

April 8, 1986.

Review Denied June 13, 1986.

William J. Mavity, Patricia Hansell, Minneapolis, for relator.

Frederick E. Finch, Kristin L. Arneson, Minneapolis, for F & M Marquette Nat. Bank.

Hubert H. Humphrey, III, Atty. Gen., Donald E. Notvik, Asst. Atty. Gen., St. Paul, for Dept. of Jobs and Training.

Heard, considered and decided by CRIPPEN, P.J., and WOZNIAK and SEDGWICK, JJ.

## OPINION

CRIPPEN, Judge.

Relator Dawn Montgomery was discharged by the respondent bank on January 31, 1985. She applied for unemployment compensation and, following a lengthy hearing, a referee from the Department of Economic Security determined that she had been discharged for reasons not amounting to misconduct. The bank appealed and a Commissioner's representative reversed, finding that certain testimony offered by the employer-bank was credible and that Montgomery had been discharged for misconduct. We affirm.

## FACTS

Relator was employed by the bank for four years as a credit secretary, an overdraft clerk, and then an overdraft supervisor. The discharge issues relate to the last two months of her work, beginning in late November 1984, the date a new manager took over the bank's credit department.

Shortly after the new credit department manager was appointed, a bookkeeping employee complained to the manager about Montgomery's attitude and interaction with other employees. A co-worker of Montgomery also approached the credit manager, complaining that Montgomery was not "pulling her weight" and that she was away from her desk at inappropriate times. Since the new manager herself had noticed that Montgomery was absent from her desk at times, she asked the co-worker to monitor Montgomery's schedule. In late November and early December, the manager received at least two customer complaints indicating that Montgomery was sometimes rude when discussing overdrafts with customers.

Between November 29 and December 4, it was observed that relator was late for work twice, that she took overly long lunch breaks on three occasions, and that one morning she went shopping for about an hour.

On December 4, the credit manager spoke with Montgomery, warning her about the bank's hours and deducting one and a half hours from her wages. On December 18, the bookkeeping employee who had previously complained about Montgomery's attitude again complained that she was rude to her fellow employees. The credit manager called Montgomery in on December 19 to discuss the complaint, and at this time Montgomery began arguing about her hours and the previous docking of her salary. She also stated to the credit manager: "You don't know what the hell you're talking about" and "How do you know when I come in?" The credit manager, believing this to be insubordinate behavior, thereafter prepared a memo placing Montgomery on probation.

The probation memo listed the following terms and conditions of probation:

1. You must report to work on time, not to leave before scheduled, and return promptly from breaks.

2. There must be no more than one valid customer complaint per month.

3. There must be no valid employee complaints regarding your performance.

4. There must be no instances of abusive or insubordinate behavior towards your supervisor or other bank officers.

The memo warned Montgomery that "[i]f any violation of these terms or conditions are seen, your employment will be terminated immediately with no further warning." This probationary status was to continue until Montgomery went on maternity leave early in 1985.

In mid-January, the credit manager again asked Montgomery's co-worker to monitor her absences. At the end of Janu-

ary, the worker reported that relator was late to work once, that twice she took overly long lunch breaks, and that on January 24 she made personal telephone calls over a period of 80 minutes. The co-worker also said Montgomery was away from her desk twice, once for 45 minutes and once for ten minutes.

On January 25, Montgomery informed the credit manager that she was unsure of savings account overdraft procedures, and the credit manager scheduled a meeting for January 28. That day Montgomery was ill and did not come into work, and during the day the credit manager discovered $28,000 in overdrafts which had not been properly handled. On January 29, the credit manager met with Montgomery and told her the overdrafts were a priority matter that should be reviewed on a daily basis. However, when the credit manager asked Montgomery on the following day if she had attended to the overdrafts, Montgomery replied that she had not. She was discharged on January 31 for being rude to customers, co-workers, and supervisors, being away from her desk without authorization on various occasions, and for failing to follow certain procedures regarding savings account overdrafts as instructed.

## ISSUE

Was Montgomery discharged for misconduct and therefore disqualified from receiving unemployment compensation benefits?

## ANALYSIS

■ An individual is disqualified from receiving unemployment compensation benefits if he or she is discharged for misconduct "connected with his work or for misconduct which interferes with and adversely affects his employment." Minn.Stat. § 268.09, subd. 1(2) (1984). Misconduct for these purposes is limited to conduct showing willful disregard of an employer's interests, or equally culpable negligence or carelessness, not conduct which is merely inefficient or unsatisfactory. *Tilseth v. Midwest Lumber Co.*, 295 Minn. 372, 374–5, 204 N.W.2d 644, 646 (1973).

■ The scope of this court's review is limited to determining whether the evidence reasonably tends to support the Commissioner's findings. *Lumpkin v. North Central Airlines, Inc.*, 296 Minn. 456, 460, 209 N.W.2d 397, 400 (1973). The findings of the Commissioner's representative, rather than the referee, are to be reviewed. *Winkler v. Park Refuse Service, Inc.*, 361 N.W.2d 120, 123 (Minn.Ct.App.1985).

■ As indicated above, Montgomery was discharged for several reasons. We have examined each reason.

1. Failure to follow the bank's instructions.

The Commissioner's representative determined that although Montgomery was told to review the savings overdrafts on a daily basis because they deserved priority status, Montgomery reported at the end of the following day that she had not done any work on them.

Upon several occasions this court has indicated that a knowing violation of an employer's policies, rules, or reasonable requests constitutes misconduct. *See, e.g., Ruzynski v. Cub Foods, Inc.*, 378 N.W.2d 660 (Minn.Ct.App.1985) (employee's violation of employer's time card policy constitutes misconduct); *Duc Van Luu v. Carley Foundry Co.*, 374 N.W.2d 582 (Minn.Ct.App.1985) (violation of absenteeism policy constitutes misconduct). In *McDonald v. P.D.Q.*, where an employee violated his employer's policy requiring cashiers to ring up purchases immediately, this court stated:

> The employer has the right to expect scrupulous adherence to procedure by employees handling the employer's money. For violating the employer's policy, [the employee] showed a substantial disregard for his employer's interests and his duties and obligations to his employer.

*McDonald v. P.D.Q.*, 341 N.W.2d 892, 893 (Minn.Ct.App.1984).

Likewise here, where $28,000 in past overdrafts had not been properly processed and where the credit manager had request-

ed that they be considered a priority item and handled on a daily basis, Montgomery's decision to ignore that request is evidence of a deliberate disregard for the bank's interests and her own obligations to her employer. The evidence on relator's response to instructions on January 29 is sufficient to support the Commissioner's finding of misconduct.

### 2. Rudeness to customers and fellow employees; insubordination.

There is evidence in the record that on several occasions, even after she was placed on probationary status, Montgomery was rude to customers, fellow employees, and supervisory personnel. Although the referee found this evidence to be vague and unsupported hearsay insufficient to support a finding of misconduct, the Commissioner's representative disagreed, noting that the record shows the credit manager continued to receive complaints about Montgomery's rudeness to customers and other employees.

At one point in the transcript Montgomery admitted that she had at one time become angry with a customer and had "slammed" down the phone. As the Commissioner's representative also noted, the record demonstrates that Montgomery became rude and angry and walked out of the December 19 meeting with the credit manager and on January 30 expressed "some resistance" to the credit manager's questioning regarding the savings overdrafts.

In *Pitzel v. Packaged Furniture and Carpet,* a salesman was aggressive and offensive to customers and refused to follow his employer's policy regarding the treatment of customers and the products sold. This court found that such conduct evidenced a willful and wanton disregard of the employer's interests and therefore constituted misconduct. *Pitzel v. Packaged Furniture and Carpet,* 362 N.W.2d 357, 357–58 (Minn.Ct.App.1985). An employee's insubordinate behavior has also been held to constitute misconduct. *See, e.g., Snodgrass v. Oxford Properties, Inc.,* 354 N.W.2d 79, 80 (Minn.Ct.App.1984) (re-

fusal to cooperate with supervisor or take directions constitutes misconduct).

The Commissioner's determination that Montgomery engaged in misconduct is sufficiently supported by the evidence in the record of her rudeness and insubordination.

### 3. Tardiness and unauthorized absenteeism during working hours.

Although the credit manager did note herself at several times that Montgomery was late for work and away from her desk, she relied primarily upon the notes taken by Montgomery's co-worker when she decided that Montgomery was violating the terms of her probation regarding tardiness and unauthorized absenteeism. The referee refused to find all of the co-worker's notations credible, reasoning as follows:

[T]he co-worker's reports are of dubious value as proof of actual times that the claimant was late/left early, etc. The co-worker was exploiting the situation involving the new manager, and once he had voiced his complaint, had a vested interest in verifying his charges. Neither the co-worker nor the credit manager were always present to observe the claimant's comings and goings, and the device of writing down times on an ad hoc basis is seriously flawed as proof of the employer's specific allegations as to times and dates and, in fact, the testimony and writings of the credit manager and the reporting co-worker did differ as to specific times.

The Commissioner's representative disagreed, finding that the co-worker's notes were reliable.

It is the Commissioner's determination regarding credibility, rather than that of the referee, which must be reviewed by this court. *Winkler,* 361 N.W.2d at 123. Where there is conflicting evidence in the record, this court is " 'not privileged to weigh the evidence and make a proper [sic] determination as to where the preponderance lies.' " *Cary v. Custom Coach, Inc.,* 349 N.W.2d 331, 332 (Minn.Ct.App.1984) (quoting *Nyberg v. R.N. Cardozo and Brother, Inc.,* 243 Minn. 361, 364, 67

N.W.2d 821, 823 (1954)). In addition to submitting the notes into evidence, the bank also called the co-worker as a witness, and he testified concerning his observations of Montgomery. This constitutes sufficient evidence to support the Commissioner's determination that the co-worker's notes were credible.

Moreover, the Commissioner's decision here dealt with more than matters of credibility, so that administrative expertise establishes a basis for deferring to the decision. *See Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 850 (D.C.Cir. 1970). This is especially the case as to uncontradicted evidence of relator's failure to respond to the employer's stated priorities for work to be done on January 29, 1985.

### DECISION

The Commissioner's determination that Montgomery's actions constituted misconduct is sufficiently supported by the evidence.

Affirmed.